**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Steven James Sturgill, | ) | |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **RE DEFENDANTS' MOTIONS FOR** |
| vs. | ) | **SUMMARY JUDGMENT** |
| | ) | |
| Williams County, ND, Ken Stenberg, | ) | |
| Misty Falcon, | ) | Case No. 4-15-cv-112 |
| | ) | |
| Defendant. | ) | |

Before the court are two motions for summary judgment, one filed by defendant Misty Falcon and the other by defendants Williams County and Ken Stenberg. (Doc. Nos. 71 & 88). Plaintiff Steven Sturgill opposes these motions, arguing disputed issues of material fact exist precluding the grant of summary judgment. (Doc. Nos. 85, 94, 96, 102).[1] For the reasons set forth below, the undersigned recommends the motions be granted and Sturgill's claims against all defendants be dismissed.

## I.     BACKGROUND

Unless otherwise noted, the following facts are either undisputed or have not been sufficiently controverted.

### A.     Falcon and Elite Fitness

Falcon is a family nurse practitioner with Elite Specialty Clinics, Inc., which does business in the Williston area under the name Elite Health & Fitness ("Elite"). (Doc. No. 74, p.1). Elite and the Williams County Correctional Center ("WCCC") entered into a service agreement under which Elite provided various medical services to inmates at WCCC. (Doc. No. 74-1). This agreement was

---

[1] During the briefing on the motions, Sturgill submitted sur-replies to each of the two motions for summary judgment without first obtaining the court's permission. Nevertheless, the sur-replies will be considered in what follows.

in effect at all times relevant to this action. The agreement required Elite to provide a nurse and/or nurse practitioner "on an 'as needed' basis (but pre-scheduled) for up to 12 hours per week . . . ." (Id.). When Falcon arrives at WCCC to begin one of her prescheduled visits, she receives a clipboard from WCCC staff containing "Request for Medical Attention" forms for inmates at WCCC seeking medical care. Falcon would then review the requests and prioritize them based upon the immediacy of their medical needs. Falcon did not do intake screenings of WCCC inmates for possible ailments when they first enter the facility. (Doc. No. 74, p.2).

**B.    Stenberg and WCCC's policies re medical and health services**

Ken Stenberg is a lieutenant with the Williams County Sheriff's Department. In that capacity, Stenberg is one of the head administrators for WCCC. (Doc. No. 90).

The WCCC Inmate Handbook provides, in relevant part, the following:

1.    Medical and health care services are available through a contract physician. It is your responsibility to notify staff of a medical problem by asking to be placed on the sick call list. Any inmates found not taking their medicine and are found with it in his/her possession later will be charged with a rule violation.

\* \* \* \*

7.    Inmates requesting medical attention will fill out a request form and give it to the Corrections Officer. Medical emergencies are to be reported immediately to the Corrections Officer so the medical staff can be contacted.

(Doc. No. 91-3, pp. 13014). According to WCCC Treatment Protocols, a treatment protocol is initiated "only upon the written or verbal orders of a licensed physician." (Doc. No. 91-4). With respect to communicable diseases, treatment protocol provides for inmate isolation, if necessary, in addition to contacting a physician or transportation to a hospital, if necessary. (Id.). Finally, according to defendant Stenberg, medical care request forms are available to the prisoners in every pod at the WCCC. (Doc. No. 90).

In dealing with methicillin-resistant Staphylococcus aurerus ("MRSA") positive inmates, WCCC claims that its accepted practice was that the inmate be isolated until the inmate has taken a few days of medication. This isolation includes an individual cell, but is not absolute. According to Stenberg, "contract medical staff had advised WCCC that MRSA positive inmate can use the same showers, telephone, and other common areas as long as the inmate's MRSA wound would not come into direct contact with surfaces in these common areas . . . ." (Doc. No. 90).

Finally, Falcon was not the only person providing medical services at the WCCC. WCCC also employed an in-house registered nurse to provide medical services. (Doc. No. 90) (stating, at "the time [Sturgill] was an inmate at WCCC . . . Jennifer May was a registered nurse and employee of WCCC."). And, if the staff nurse had questions, the staff nurse could call Falcon in between her visits. (Doc. No. 74, p. 2). Also, as demonstrated by the record here, a prisoner could be taken to see a doctor, including at the emergency room, when circumstances warranted. (Id.).

## C.    Events relevant to this action

Steven Sturgill was admitted into WCCC on Wednesday, May 20, 2015, at approximately 10:09 p.m. (Doc. No. 73-1). On his intake form, the admitting jailer noted Sturgill reported he had the following conditions: "COPD head injury 12 years ago claims to have broken brain stem. Hep-C Depression and Bi-Polar." (Doc. No. 91-1). On the intake sheet, the admitting jailer also responded "yes" to the query of whether Sturgill had "[a]ny signs of poor skin conditions, vermin, rashes or needle marks . . . ." (Doc. No. 73-2). In explaining this affirmative answer, the intake form notes Sturgill had lacerations on his forehead. The admitting form did not note any other issues with Sturgill's skin condition or mention any other medical issues Sturgill may have had. (Id.).

According to Sturgill, he complained of a swollen face early the next morning on May 21,

2015, and was advised by jail personnel that the medical care provider would be alerted. Sturgill claims that, later in the morning, he informed WCCC personnel he now had a "pusshole" in the side of his face. According to Sturgill, jail personnel advised him they would inform Falcon, who was providing services at the time, of his condition. Sturgill also claims that, during his noon meal he again informed WCCC personnel there was pain, swelling, and a hole in his face, to which the personnel allegedly responded they had informed Falcon but Falcon could not see him that day because she was very busy and that she would see him the next Tuesday after she returned from the four-day Memorial weekend. (Doc. No. 85-1). According to an affidavit submitted by Daniel Bellard, Sturgill's cellmate on May 21, 2015, Bellard overheard a conversation between WCCC personnel that "the nurse and the lieutenant spoke and decided that Sturgill could wait until the nurse returned for any treatment (or words to that effect)." (Doc. No. 99).

Falcon and Stenberg both filed affidavits attesting they had no knowledge of Sturgill's complaints or his condition on May 21, 2015. In support, both defendants point to the lack of any completed written request by Sturgill for medical care on May 21. (Doc. Nos. 74, 90).

Sturgill does not contend that he filled out a written request for medical care on May 21, 2015. Rather, he claims that, when he orally complained about his condition that morning, jail staff stated that a request would be filled out for him, once when he initially complained and again later when he pressed an emergency call button advising his condition had gotten worse. (Doc. Nos. 85-1, pp. 2-3; 85-2).

While WCCC's policies suggest that prisoners are required to fill out a request for medical care in order to be seen by a medical care provider, it is not clear from the record that this was required in *all* instances either by the WCCC's written policies (which appear to be ambiguous in

that regard), but, more importantly, as a matter of practice. Aside from Sturgill's affidavit testimony which suggests that an oral request was sufficient in some instances (if he is to be believed), there are also the requests for medical care that WCCC produced for the number of times that Sturgill was seen by a medical care provider. Notably, in the portion of the request forms that one would think would have been filled out by Sturgill, there is an obvious difference in the handwriting when comparing from one to another. Further, it is clear from the language used in some of the requests that the person who filled it out (even the initial portion) was not always Sturgill and may have been the medical care provider at the time Sturgill was seen, presumably then based on an oral request. (Doc. No. 91-5). Consequently, there may be some question with respect to defendants' contention that the absence of a written request for medical care on May 21 necessarily means Sturgill's purported oral requests for medical care on that date were not passed on by jail staff to the medical care provider providing service that day, which was Falcon.

As noted earlier, Elite had contracted to provide medical services to WCCC on the limited basis of 12 hours per week. For the initial time period in question here, Falcon states in her affidavit that she was seeing prisoners at the WCCC on Thursday, May 21, 2015, from 8:00 a.m. to 1:00 p.m., which is during the time that Sturgill claims he made complaints about his infection and further claims that he was advised by jail staff that his complaints had been passed on to the person providing medical care on that date. Falcon further attests in her affidavit that she did not provide any medical services during the period from Friday May 22, 2015 through Monday May 25, 2015, which was Memorial day. (Doc. No. 74, p.3).

According to Sturgill, he continued to inform WCCC personnel he was in need of medical assistance from May 22-24, 2015. (Doc. No. 85-2). On Sunday, May 24, 2015, WCCC personnel

took Sturgill to the emergency room because his condition had worsened. Defendants contend that Sturgill filled out a request for medical care on that date, but, when comparing that request to other requests Sturgill more likely fill out, that is subject to question. (Doc. Nos. 73-7; 91-5). At the emergency room, Sturgill saw Dr. Richard Martin, who diagnosed Sturgill with a "facial skin abscess - possible MRSA culture pending." (Docket No. 73-3). Dr. Martin recommended:

> Daily 1-2x soap & water wash to face, pat dry, dressing
> Nurse to evaluate & change packing 3x/week
> Bactrum DS 2 tablets twice daily 10 days
> Return to ER if fever over 101 or [up arrow] swelling.

(Doc. No. 73-3).

On May 26, 2015, Falcon treated Sturgill. (Doc. No. 73-7). According to Falcon's notes, Sturgill had an abscess on his jaw and she prescribed him ibuprofen for one week in addition to the treatment prescribed by Dr. Martin, including continuation of the antibiotics. (Doc. Nos. 73-7; 74-2). In addition, Falcon attests to having a conversation with "the Lieutenant," during which she recommended "Sturgill remain isolated from the general prison population." (Doc. No. 74, p. 4).

The test on the culture taken in the emergency room was run on May 26, 2015, although there is some evidence it was not communicated to the WCCC until June 2 when it was sent by fax. (Doc. No. 91-6). Once Falcon received the results she concluded that Dr. Martin's prescribed course of treatment would be effective because the strain of MRSA identified was sensitive to the antibiotic he had prescribed. (Doc. No. 74). Once WCCC received the test results confirming Sturgill's MRSA diagnosis, "WCCC moved Sturgill to an individual medical cell in B Pod, as it was WCCC policy, pursuant to advisement by contract medical staff, to isolate inmates diagnosed with MRSA until the inmate had been taking medication for a few days." (Doc. No. 90).

From May 27, 2015 through June 1, 2015, Sturgill saw the WCCC's staff nurse three times

to change the wound dressing and during which the nurse noted progress with Sturgill's MRSA. (Doc. Nos. 73-8; 73-9; 73-10). Falcon again saw Sturgill on June 4, 2015, following Sturgill filing a request for medical attention form. (Doc. No. 73-11). During the visit, Falcon noted Sturgill felt much better and directed Sturgill to continue with his prior course of treatment. (Doc. No. 73-11, 74). Sturgill again saw the staff nurse three more times from June 5-11, 2015, (Doc. Nos. 73-12; 73-13; 73-14), during which the nurse noted continued progress with Sturgill's MRSA, resulting in the MRSA wound being closed by June 11, 2015. Sturgill next saw Falcon for treatment on June 16, 2015, during which he complained of facial pain and flu-like symptoms. (Doc. No. 73-15). Falcon diagnosed Sturgill with neuropathy and prescribed him Neurontin to be taken for two weeks. (Doc. No. 73-15; 74). From June 25, 2015 until his transfer from WCCC, Falcon periodically saw Sturgill pursuant to various requests for medical attention regarding ailments unrelated to this action. (Doc. Nos. 74-5; 74-6; 74-7; 74-8).

D.      **This action**

In this action brought pursuant to 42 U.S.C. § 1983, Sturgill sues Falcon and Stenberg in both their individual and official capacities as well as Williams County for alleged violations of the Eighth Amendment. More particularly, Sturgill alleges that defendants: (1) did not take proper precautions to protect against MRSA within WCCC causing him to contract it; (2) wrongfully delayed his treatment for MRSA, and (3), when he was provided treatment, it was inadequate. With the court's leave, (Doc. No. 66), Sturgill filed an amended complaint seeking punitive damages against the defendants. (Doc. No. 68).

II.      **INDIVIDUAL CAPACITY CLAIMS**

A.      **Qualified immunity**

In their motions for summary judgment, Falcon and Stenberg both contend that they are entitled to qualified immunity from suit against them in their individual capacities.[2]  The Eighth Circuit has described qualified immunity in the following manner:

> "In a § 1983 action, state actors may be entitled to qualified immunity." Riehm v. Engelking, 538 F.3d 952, 962 (8th Cir.2008). "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' " Id.,quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). "To overcome the defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." Howard v. Kansas City Police Dep't., 570 F.3d 984, 988 (8th Cir.2009). This court exercises its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id., quoting Pearson, 129 S.Ct. at 818.

McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009).

## B.     The Eighth Amendment's protection against deliberate indifference to a prisoner's serious medical needs

In this case, the constitutional right that Sturgill invokes is the Eighth Amendment's protection against cruel and unusual punishment, which is violated when prison officials exhibit deliberate indifference to a prisoner's serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 104 (1976); Popoalii v. Correctional Med. Services, 512 F.3d 488, 499 (8th Cir. 2008).[3]  Since the right

---

[2]  In order to prevail on a claim under § 1983, Sturgill must demonstrate the person allegedly depriving him of his constitutional rights was acting under color of state law.  Generally, courts consider the providing of medical or other professional services by a private party pursuant to a contract with a state or one of its entities to be state action for § 1983 purposes.  West v. Atkins, 487 U.S. 42, 54 (1988) (holding a doctor, "as a physician employed by North Carolina to provide medical services to state prison inmates, acted under color of state law for purposes of § 1983 when undertaking his duties in treating [the inmate's] injury."); Montano v. Hedgepeth, 120 F.3d 844, 849 (8th Cir. 1997) (stating "professionals in the state's employ can, and regularly will, qualify as state actors.").  In this case, Falcon does not dispute she is a "state actor" and is subject to suit under § 1983.  Rather, her argument is that, as a state actor, she is entitled to qualified immunity given the particular circumstances of this case.

[3]  Since this is the standard that the parties have presented and briefed, it is the one that will be applied.  The record is not clear, however, whether Sturgill was being held in WCCC on pretrial or posttrial detention during the time period relevant to his claims and the court is aware that the WCCC houses both types of prisoners.  Under governing Eighth Circuit precedent, however it does not make a difference because  the Eighth Circuit has instructed:
      This court analyzes a pretrial detainee's § 1983 claim under the Due Process Clause of the Fourteenth

of prisoners to adequate medical care is clearly established, see id., the focus of the present motions is upon the first prong of the qualified immunity analysis, *i.e.*, whether, in light most favorable to Sturgill, he has presented sufficient evidence of a violation of his Eighth Amendment rights.

To prevail on a claim of constitutionally inadequate medical care in violation of the Eighth Amendment, a prisoner must prove both an objective and a subjective component: (1) that the prisoner suffered from an objectively serious medical need; and (2) that prison officials knew of the need and deliberately disregarded it, *i.e.*, they were "deliberately indifferent" to the serious medical need. Eg., Dadd v. Anoka Cty., 827 F.3d 749, 752 (8th Cir. 2016); Jackson v. Buckman, 756 F.3d 1060, 1065 (8th Cir. 2014). "A medical need is serious when it has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Phillips v. Jasper Cty. Jail, 437 F.3d 791, 795 (8th Cir. 2006). Deliberate indifference requires a showing of a mental state akin to criminal recklessness – "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994); see Jackson, 756 F.3d at 1065. Deliberate indifference is "more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Popoalii, 512 F.3d at 499 (quoting Estate of Rosenberg v. Crandell, 56

---

Amendment, not under the Eighth Amendment. Kahle v. Leonard, 477 F.3d 544, 550 (8th Cir.2007), cert. denied, 552 U.S. 826, 128 S.Ct. 201, 169 L.Ed.2d 37 (2007). "This makes little difference as a practical matter, though: Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment." Id.
McRaven, 577 F.3d at 979-80; see also Ryan v. Armstrong, 850 F.3d 419, 425 & n.2 (8th Cir. 2017) (same but noting it is an open question in the Eighth Circuit whether the Fourth Amendment or the Due Process Clause of the Fourteenth Amendment applies to "arrestees" as distinguished from pretrial detainees). While application of Eighth Amendment standards to pretrial detainees may be questionable given the Supreme Court's decision in Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473-74 (2015) (concluding that the Fourth Amendment's "objective" standard applies in excessive force cases involving pretrial detainees and, for that reason, consideration of the defendant's subjective state of mind in that case was improper), this court is bound by the existing Eighth Circuit precedent.

F.3d 35, 37 (8th Cir. 1995)).  Consequently, medical malpractice alone does not amount to deliberate indifference.  Jackson, 756 F.3d at 1065-66.  "An inmate must demonstrate that a prison doctor's actions were 'so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care.'"  Id. at 1066 (quoting Dulany v. Carnahan, 132 F.3d 1234, 1240-41 (8th Cir. 1997)).

"When [an] inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, the objective seriousness of the deprivation should also be measured by reference to the *effect* of delay in treatment."  Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005) (italics in original; quotation and internal quotation marks omitted).  "To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment."  Id. (quotation and internal quotation marks omitted).  If verifying medical evidence is not presented, summary judgment is appropriate.  See id.; Cullor v. Baldwin, 830 F.3d 830, 837 (8th Cir. 2016); Jackson v. Riebold, 815 F.3d 1114-119-20 (8th Cir. 2016).

### C.  Falcon

Sturgill's claims of deliberate indifference on the part of Falcon can be broken into two components:  (1) Falcon's not providing him with care on May 21, 2015; and (2) the care that Falcon did provide him with respect to his MRSA from May 26, 2015 onward.[4]

### 1.  Deliberate indifference - May 21, 2015

According to Sturgill, he first began to complain of pain in his cheek during the early morning of May 21, 2015 - just a matter of hours after his entry into the facility late the previous evening.  (Doc. No. 85-1).  He claims he did so by verbally alerting the jailers.  (Doc. No. 85-2).

---

[4]  At one point in his briefing, Sturgill suggested that Falcon should have screened him upon his entry to the facility either on the evening of May 20 or the next day.  However, the record is clear that Falcon did not do intake screenings.

Sturgill's affidavit, in pertinent part, provides:

> [¶ 18]  That each officer informed Affiant that the nurse, namely; Defendant Misty Falcon had been informed about the hole in Affiant's face and the swelling, and the Defendant Misty Falcon told the officers she would see Affiant on Tuesday, May 26, 2015, when she returns, because she didn't have time now because she wanted to leave by 2:00 p.m., so that Defendant Misty Falcon could enjoy a four-day Memorial Day weekend.

(Doc. No. 85-2).  Daniel Bellard, Sturgill's cellmate on May 21, 2015, further attested:

> [¶ 5]  That Affiant listened to a conversation between Sturgill and a Williams County Correctional Officer, whereby the Officer told Sturgill that the nurse at the Williams County Correctional Center had been informed of Sturgill's MRSA on the day before she went on vacation for memorial [day] week-end, and that the nurse and the lieutenant spoke and decided that Sturgill could wait until the nurse returned for any treatment (or words to that effect).

(Doc. No. 99) ("Bellard affidavit').

Falcon provided a competing affidavit attesting she was not aware of Sturgill or his condition on May 21, 2015, and only became aware of Sturgill on May 26, 2015.  (Doc. No. 74).  Because of these competing affidavits, Sturgill argues that there is a disputed issue of fact as to whether Falcon knew of his medical need on May 21, 2015, but did nothing about it.

The court need not decide whether what Sturgill has presented, along with what is otherwise in the record, is sufficient to create a fact issue as to whether jail personnel had made Falcon aware that Sturgill was seeking medical care on May 21.[5]  This is because it does not make any difference

---

[5]  Defendants argue that the affidavit testimony presented by Sturgill is all inadmissable hearsay; hence, it should not be considered. As noted earlier, Sturgill claims he asked several times for care on the morning of May 21, 2015, and was told that his requests had been passed on to Falcon, who was providing medical services on that day. While it may be that some of what is contained in the affidavits submitted by Sturgill is inadmissible hearsay, it may be a close question as to whether it all is, particularly if the method of communication of the status of medical requests employed by the WCCC was for the jail personnel with whom Sturgill communicated to pass that information back to him.  Also, if the actual practice of jail personnel was to pass on oral requests for medical care to the medical care provider, this practice, coupled with Sturgill's testimony that he made oral requests, may be sufficient circumstantial evidence to raise a disputed question of fact with respect to whether his alleged requests on May 21 were communicated to Falcon.  As noted earlier, there is some evidence which suggests that what the WCCC claims were its policies were not necessarily followed in practice.

in terms of the outcome of Falcon's motion for summary judgment for two reasons

First, Sturgill has failed to demonstrate the claimed delay resulted in a constitutional violation due to his failure to provide any medical evidence verifying the detrimental effect of the claimed delay as required by the precedent cited above.[6]  Second, even if Falcon had been made aware of Sturgill's request for medical care and even if she concluded he could wait (that is ignoring the question of whether the evidence of this is inadmissible hearsay as defendants claim), the most Sturgill would have proved is that *possibly* Falcon was negligent in her judgment in terms of whether the condition described to her was serious enough to have required immediate attention, keeping in mind that jail staff always had the option of obtaining medical care for Sturgill if it that turned out that he needed attention before she was scheduled to provide service on Tuesday of the following week. And, in fact, jail personnel did take Sturgill to the emergency room on Sunday, over the holiday weekend, demonstrating this was not just a theoretical possibility.

### 2.    Deliberate Indifference - May 26, 2015, onward

Sturgill also contends that Falcon failed to provide appropriate care when she did return on May 26 in two respects. First, he faults Falcon for not providing him with supplies to deal with his MRSA, such as soap, clean linens, cleaning supplies, etc.  Second, he faults Falcon for not providing

---

[6] Sturgill assumes he had MRSA on the 21st, but, while that might be, it would be mere speculation for a jury to reach that conclusion without help from a medical expert since he possibility could have contracted it over the next two days prior to being taken to the emergency room on the 24th.  In fact, even on the 24th, the emergency room physician was not able to make a definitive diagnosis simply by an examination; the fact that Sturgill had MRSA was determined several days later after the culture that was taken on the 24th tested positive for it.  Without expert guidance, the jury would not know whether what was required on the 21st was aggressive treatment or simply a cold compress subject to re-evaluation over the next couple of days when Falcon was not obligated to provide  medical service.

Sturgill identified his step-father, Rich Gahagan, a micro-biologist, as a possible expert witness.  By his own admission, however, Sturgill concedes "Mr. Gahagan's field of expertise is not MRSA and Mr. Gahagan's thought is that he would be of no help . . . ." (Doc. No. 85-1 p. 15).  More fundamentally, however, Sturgill has not provided any information indicating to what Mr. Gahagan might testify at trial.

additional medical care for him, including not conducting additional blood tests, not returning him to the doctor following completion of his medication, not providing him with mental health evaluations, and not properly instructing WCCC personnel on how to handle his MRSA. (Doc. Nos. 85-1 p. 4).

As discussed above, however, Dr. Richard Martin saw Sturgill at the emergency room on May 24, 2015, during which he concluded Sturgill possibly had MRSA—with confirmation pending the outcome of a culture analysis—and prescribed treatment that included dressing of the infected area, providing instructions for periodic changes of the dressing, the prescription of antibiotics, and instructions that Sturgill be returned to the emergency room if he was to have fever of over 101 degrees or an increase in swelling. (Doc. No. 73-3). When Sturgill saw Falcon two days later on May 26, 2015, she recommended continuation of this treatment and also recommended Sturgill be isolated from the general population. (Doc. No. 74). When Sturgill's culture results came back positive for MRSA, but indicating that the strain of MRSA was sensitive to the antibiotic Dr. Martin prescribed, Falcon ordered that Sturgill continue on that antibiotic and that he otherwise follow the treatment Dr. Martin had recommended. (Doc. No. 74). Prior to seeing Falcon again on June 4, 2015, Sturgill saw the jail's in-house nurse multiple times to have the packing and dressing changed on his cheek. (Doc. Nos. 73-8; 73-9; 73-10). When Falcon saw Sturgill again on June 4, 2015, she noted Sturgill felt much better and directed Sturgill to continue cleaning the wound, changing the bandages, and taking his medication. (Doc. No. 74). By June 11, 2015, the wound on Sturgill's face had closed. (Doc. No. 73-14). On June 16, 2015, Sturgill complained of a swollen face in the area of the wound and flu-like symptoms, for which Falcon prescribed Neurontin to treat the pain. From thereon out, Falcon periodically saw Sturgill for a number of medical complaints unrelated to the

MRSA.  (Doc. No. 74).

Viewing this evidence most favorably to Sturgill, he has not provided evidence sufficient to demonstrate (or even raised a disputed issue of fact as to) whether the care Falcon provided was inadequate, much less that it rose to the level of criminal recklessness. In providing care during this two week time period beginning May 26, Falcon did not deny or delay providing Sturgill with the medical care recommended by Dr. Martin, nor did she interfere with Dr. Martin's prescriptions. And, although not controlling, Falcon's continuation of the treatment ordered by Dr. Martin was ultimately successful in ridding Sturgill of his MRSA within a matter of weeks

In arguing to the contrary, Sturgill faults Falcon because, in his estimation, Falcon could have ordered WCCC personnel provide him with cleaning supplies and fresh linens, could have taken him to the doctor or conducted blood work to validate the success of his MRSA treatment, could have provided him with a mental evaluation, etc.  (Doc No. 85-1).  Simply because Falcon could have provided an alternative course of treatment, or recommended that WCCC personnel provide Sturgill with fresh clothes and cleaning supplies, does not mean the care she provided was constitutionally inadequate.  Dulany v. Carnahan, 132 F.3d 1234, 1241 (8th Cir. 1997) (stating the "existence of a possible alternate course of treatment, which 'may or may not' have been successful, is not sufficient to raise an inference of deliberate indifference where the prison officials acted reasonably but ultimately failed to avert the harm.").  While Sturgill would have liked, for instance, to have blood testing or a doctor visit to confirm abatement of his MRSA, he did not have a constitutional right to his preferred treatment of choice.  Id. at 1239.  (stating "inmates have no constitutional right to receive a particular or requested course of treatment . . . .").  Also, Falcon was not the only one providing Sturgill with care; the WCCC staff nurse was also providing care in accordance with Dr.

Martin's instructions. Finally, Sturgill has not presented any expert evidence which suggests the outcome would have been different had the things he claims Falcon should have been done during this time period were done.

### 3. Summary re Falcon

In summary, Sturgill has failed to demonstrate that Falcon was deliberately indifferent to his medical needs even construing the record evidence most favorably for him. Consequently, Falcon is entitled to a dismissal of the claims against her based on qualified immunity.

### B. Stenberg

One of the allegations of deliberate indifference that Sturgill makes against Stenberg is that he was the person responsible for having "scheduled a facility nurse for twelve (12) hours per week for over 100 inmates . . . ."[7] (Doc. No. 97 at ¶ 22). Sturgill argues limiting available medical care to this extent "was a reckless action and deliberate indifference" to the medical needs of himself and other prisoners. (Doc. No. 97 at ¶ 45). Sturgill contends that:

> But for Defendant Williams County, ND and Ken Stenberg's deliberate indifference and failures, Plaintiff would have received medical care on May 21, 2015 for the MRSA eating his face and would not had to lay in his own puss and blood for four (4) days and would not have the current anxiety, concerns and fears.

(Doc. No. 97 at ¶ 40).

This argument fails, however, for the simple reason that the undisputed facts demonstrate that

---

[7] Throughout his briefing, Sturgill faults WCCC for "not having a facility nurse for more than twelve (12) hours per week . . . ." (Doc. No. 97 at p. 11). If this was the only medical care that the WCCC provided, Sturgill might have a point with respect to whether the WCCC was overall providing adequate medical care. The record, however, does not reflect that Falcon was the only person providing medical services. WCCC also employed an in-house nurse to provide medical services. (Doc. No. 90) (stating, at "the time [Sturgill] was an inmate at WCCC . . . Jennifer May was a registered nurse and employee of WCCC."). Also, as the record in this case bears out, WCCC officials always had the option of taking a prisoner to the emergency room and, presumably, would have taken prisoners to a doctor for other care if in Falcon's assessment that was required.

the medical care that was available to prisoners at the WCCC was not as limited as Sturgill contends. As noted earlier, WCCC also employed an in-house nurse to provide medical services. (Doc. No. 90). In addition, as noted in Falcon's affidavit testimony and as the record in this case bears out, jail personnel always had the option of taking a prisoner to the emergency room.

Sturgill also claims that Stenberg had been advised of Sturgill's condition on May 21 and that he should have taken action to ensure he was seen by Falcon rather than accept Falcon's purported determination that Sturgill could wait until the next week to be seen. This delay-in-providing-treatment claim suffers from the same deficiency as Sturgill's similar claim against Falcon in terms of his failure to provide medically verifiable evidence with respect to the impact of the purported delay. Also, even if it was to be assumed that Stenberg and Falcon had a conversation to the effect that Sturgill's condition did not require immediate care, so he could wait, and the evidence of that purported conversation is not inadmissible hearsay (which it appears to be),[8] there would remain insufficient evidence to demonstrate criminal recklessness for the reasons already articulated with respect to Falcon. In fact, if the conversation did take place, Stenberg, arguably, could reasonably rely upon the professional advice given by Falcon that Sturgill could wait.

Sturgill may also to be claiming that Stenberg was deliberately indifferent in not seeing that other care was provided to him prior to his being taken to the emergency room on May 24 and/or in not seeing to it that he was immediately isolated after Dr. Martin noted the possibility of MRSA. However, to the extent he is, he has failed to demonstrate that Stenberg had any personal knowledge

---

[8] The only evidence that Stenberg was personally aware of Sturgill's alleged requests for medical care on May 21 is Ballard's affidavit testimony recounting what jail personnel had said about a purported conversation between Stenberg and Falcon that they overheard. This is classic hearsay. And, without anything more, Sturgill has failed to demonstrate any personal involvement on Stenberg's part with respect to what happened or did not happen on May 21.

or involvement of Sturgill's condition during this time period, which is required to hold him personally liable. See Riehm v. Engelking, 538 F.3d 952, 962 (8th Cir. 2008) (noting a § 1983 claim against a supervisor fails where there is no evidence the supervisor "was directly involved in the alleged constitutional violations or that [the supervisor] failed to train or supervise" employees).

In short, Sturgill has failed to make out a submissible claim of deliberate indifference as to a serious medical need on Stenberg's part. Hence, he is entitled to qualified immunity.

Finally, Sturgill claims that Stenberg did not have him immediately isolated from the general population when Dr. Martin suspected he possibly might have MRSA. In fact, Sturgill disputes Stenberg's claim that he was isolated after the results of the test of the culture came back positive for MRSA, although not with submissible evidence. (Doc No. 102, pp. 5-5). The court need not wade into these matters further because Sturgill at that point was well on the way to recovery and, in any event, he has failed to provide any medical evidence indicating the *purported* failure to isolate him was a causal element in the harm Sturgill claims he suffered.

## III.   OFFICIAL CAPACITY CLAIMS

Falcon, Stenberg, and Williams County also seek summary judgment as to Sturgill's official capacity claims. In considering official capacity claims under § 1983, the Eighth Circuit has said:

> A suit against a governmental actor in his official capacity is treated as a suit against the governmental entity itself. Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (citing Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). A governmental entity cannot be held vicariously liable for its agent's acts under § 1983. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, a plaintiff must identify a governmental "policy or custom that caused the plaintiff's injury" to recover from a governmental entity under § 1983. Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (citations and quotations omitted). A governmental policy "involves a deliberate choice to follow a course of action ... made from among various alternatives by an official who has the final authority to establish governmental policy." Doe v. Special Sch. Dist., 901 F.2d 642, 645 (8th Cir.1990) (quotations and citations omitted). A governmental custom involves "a pattern of 'persistent and widespread' ... practices which bec[o]me so 'permanent and well

settled' as to have the effect and force of law." Id. at 646 (quoting Monell, 436 U.S. at 691, 98 S.Ct. 2018).

Brockinton v. City of Sherwood, Ark., 503 F.3d 667, 674 (8th Cir. 2007).

One of the "official capacity' claims that Sturgill makes is his contention that the medical care made available to prisoners at the WCCC, including himself, was constitutionally inadequate because it was limited to Falcon seeing prisoners for only 12 hours per week. However, this claim fails for the reason already discussed, *i.e.*, medical care at the WCCC was not so limited, other care was available and provided.

Sturgill also contends:

> After I was suspected of having MRSA, (or at least staph infection) I was not locked down, segregated, nothing. I showered in the same shower, ate in the chow hall & was expected to put my clothes in w/ everyone else. I washed my own clothes & scrubbed the shower after I used it. The jail has no training or protocol regarding Staff & MRSA & I believe that is why I caught it.

(Doc. No. 6 at p. 6). This claim also fails. As discussed above, Stenberg and Williams County have submitted documentation establishing WCCC had established protocol for handling inmates with diagnosed communicable diseases, as well as an established practice for dealing with MRSA in particular. (Doc. Nos. 90; 91-4). In light of this, Sturgill's briefing essentially concedes these points and his argument morphs into a claim that, although WCCC may have had treatment protocols in place, such protocols were not followed with regard to him. (Doc. No. 97 p. 7) (stating WCCC "didn't isolate Plaintiff and did not call a physician . . . clear violation of their own policy and protocol."); (Doc. No. 97 p. 11) (stating WCCC "failed to follow their own policy and protocol for communicable diseases . . . ."). With this shift, Sturgill's official capacity claims turn on whether he is able to show a continuing and accepted practice on the part of WCCC in failing to follow such procedures. This requires a showing of:

> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> 3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

Johnson v. Douglas County Medical Dept., 725 F.3d 825, 828 (8th Cir. 2013) (citations omitted).

And, in this case, Sturgill has not demonstrated there was a continuing, widespread, persistent pattern of WCCC personnel disregarding their communicable disease protocol. Rather, he focuses solely on how WCCC personnel handled his MRSA situation over approximately a three week period and ignores the evidence of WCCC following its policy, including providing medical care to Sturgill appropriate to the disease and isolating him to the extent deemed prudent under the circumstances when it received confirmation that he had MRSA.[9] (Doc. No. 90). Both the limited duration and limited scope of WCCC's alleged disregard of its communicable disease protocols, even if taken as true, are not enough to raise a disputed issue of whether that disregard was so pervasive and accepted so as to constitute a custom for § 1983 purposes. See Wedemeier v. City of Ballwin, Mo., 931 F.2d 24, 26 (8th Cir.1991) ("a single deviation from a written, official policy does not prove a conflicting custom."). Further, the mere fact that the WCCC may have imperfectly implemented it policies does not amount to criminal recklessness. [10] Finally, Sturgill has failed to

---

[9] The MRSA was confined to an infection on Sturgill's face and was protected by a dressing. Hence, that alone provided substantial protection and, according to the WCCC, limited the degree that Sturgill needed to be isolated under its policies for dealing with MRSA. (Doc. No. 90).

Sturgill attempted to claim he was not isolated at all in his sur-reply. However, what he presented was insufficient to rebut the evidence proffered by William County to the contrary in terms of creating a fact issue both in substance and as a matter of procedure. (Doc. No. 102, pp. 5-6).

[10] Sturgill also claimed there was a lack of training but offered nothing more with respect to this allegation than surmise and conjecture.

provide evidence that the WCCC's purported failure to follow its policies with respect to communicable diseases, including MRSA, was the proximate cause of any harm he claims he suffered. As noted by the Sixth Circuit in a MRSA case: [T]he failure to implement an official policy is different from showing that the policy *itself* was the 'moving force' behind the alleged constitutional violation." <u>Bowers v. Livingston County</u>, 426 Fed.Appx. 371, 372 (6th Cir. 2011) (unpublished) (emphasis in original).

In short, the record here is devoid of evidence sufficient to support Sturgill's deliberate indifference claims against Williams County.

## IV.   <u>RECOMMENDATION</u>

Based on the foregoing, it is **RECOMMENDED** that:

1.   Defendant Misty Falcon's Motion for Summary Judgment (Doc. No. 71) be **GRANTED**.

2.   Defendant Ken Stenberg and Williams County's Motion for Summary Judgment (Doc. No. 88) be **GRANTED**.

2.   Plaintiff Steven Sturgill's claims against Falcon and Stenberg, both in their official and individual capacities, along with his claims against Williams County be **DISMISSED WITH PREJUDICE.**

## <u>NOTICE OF RIGHT TO FILE OBJECTIONS</u>

Pursuant to D.N.D. Civil L.R. 72.1(D)(3), any party may object to this recommendation within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file appropriate objections may result in the recommended action being taken without further notice or opportunity to respond.

Dated this 24th day of  August, 2017.

/s/  Charles S. Miller, Jr.

Charles S. Miller, Jr., Magistrate Judge
United States District Court
